BRIAN J. STRETCH (CABN 163973)
United States Attorney

BARBARA J. VALLIERE (DCBN 439353)
Chief, Criminal Division

JOSE A. OLIVERA (CABN 279341)
Assistant United States Attorney
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-6888
Facsimile: (415) 436-7009
E-mail: jose.olivera@usdoj.gov
Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCICSO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>YAOWAPHA RITDET,<br><br>Defendant. | CASE NO. 14-CR-215-EMC<br><br>UNITED STATES' SENTENCING MEMORANDUM<br><br>Judge: Hon. Edward M. Chen<br>Sentencing Date: April 26, 2017<br>Time: 2:30 p.m.<br>Location: Courtroom 5, 17th Floor<br>450 Golden Gate Avenue<br>San Francisco, CA 94102 |

The United States of America ("Government"), through its undersigned counsel, respectfully submits the following Sentencing Memorandum pursuant to Crim. L.R. 32-5(b).

## I. INTRODUCTION

### A. Summary of Government's Sentencing Recommendations

On August 2, 2016, defendant Yaowapha Ritdet ("Ritdet") was charged by Superseding Information with one count of corruptly endeavoring to impede and impair the due administration of the Internal Revenue Laws (Count 1), in violation of 26 U.S.C. § 7212(a); and one count of harboring illegal aliens for commercial advantage or private financial gain (Count 2), in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii),(v)(II), and (B)(i). On August 17, 2016, Ritdet pled guilty to Counts 1 and 2 of the Superseding Information. Ritdet's sentencing is scheduled for April 26, 2017.

The Presentence Investigation Report ("PSR") correctly computes Ritdet's total offense level under the U.S. Sentencing Guidelines as 17, and her criminal history as a category I, which results in a Guideline's sentencing range between 24 and 30 months of incarceration. (PSR ¶¶ 52 & 85.) Both the PSR and the plea agreement recommend the following sentence: 24 months' incarceration, three years supervised release, restitution in the total amount of $567,755.66, and a mandatory special assessment of $200.[1] (PSR, p. 23.) The restitution allocation and priority of payments are set forth below.

The sentence recommended by the PSR and agreed upon by the parties accurately reflects Defendant's criminal conduct and any mitigating factors. The Court should impose the recommended sentence.

**B. Summary of The Case**

From 2007 through 2013, Ritdet and her husband, Steve Walter, resided in Ukiah, California. During that period, Ritdet was the sole owner of two restaurants, Ruen Tong Thai Cuisine and Walter Café. (Exhibit 4, p.1, ¶ 2.) In 1995, before Ritdet and Walter were married, Ritdet owned and operated Ruen Tong Thai Cusine. (*Id.*) In or about 2007, Ritdet opened Walter Café. (*Id.*) Walter was not listed as an owner of either restaurant, but did assist Ritdet in managing both restaurants. Property and bank records confirm that Ritdet owns the properties where Ruen Tong Thai Cuisine and Walter Café are located. (PSR ¶ 80.) Similarly, the residence where Ritdet's employees were housed and her and Walter's residence were both in her name alone. (Exhibit 4, p. 2, ¶ 20 & p. 5, ¶ 2.)

For 2007 through 2011, Ritdet and Walter filed joint federal income tax returns. In or around 2012, the IRS began investigating Ritdet and Walter for underreporting their income on their 2007 through 2011 federal income tax returns.

<u>IRS Investigation</u>

From 2007 through 2011, both Ruen Tong Thai Cuisine and Walter Café received payment by credit/debit card, check, and cash. (Exhibit 4, p. 1, ¶ 5.) Nearly all of the gross receipts received by the restaurants were from credit/debit cards and cash. The credit/debit card payments were deposited

---

[1] The restitution recommended by the PSR and the Government is less than the amount set forth in the plea agreement. The new restitution figure is based on U.S. Department of Labor, Wage & Hour Division, computations that were recently performed. (Exhibits 1 & 2.) These computations are identical to those submitted for defendant Steve Walter's sentencing.

directly into each restaurant's corresponding bank account. All, or nearly all, of the cash payments received by the two restaurants was deposited into Ritdet's or Ritdet and Walter's personal bank accounts, not the business bank accounts for each restaurant. (Exhibit 4, p. 6, ¶ 12.) It is the amounts deposited into those personal bank accounts that neither Ritdet nor Walter reported on their federal income tax returns for 2007 through 2011.

Ritdet handled nearly all financial aspects of the two restaurants, including communications with the restaurants bookkeeper and Ritdet and Walter's tax return preparer. Ritdet's scheme was to skim cash from her two restaurants and not report those amounts to the IRS. At the end of each night at the two restaurants, daily tally sheets were completed by Ritdet's employees and taken to Ritdet's residence located at 479 N. Oak Street, Ukiah, California. The daily tally sheets reported each restaurant's gross receipts for the day, along with employee tips received. During the execution of search warrants, IRS agents seized hundreds of daily tally sheets. Exhibit 5, pages 1 and 2, are true and correct copies of daily tally sheets seized. The daily tally sheets, however, were not sent to Ritdet's bookkeeper and tax return preparer. Rather, Ritdet created monthly summary sheets for the two restaurants and sent the summaries to her bookkeeper along with records from bank accounts for the two restaurants. IRS agents recovered dozens of monthly tally sheets during the execution of search warrants in this case, and a true and correct copy of a monthly summary sheet is attached as Exhibit 5, page 3. On September 27, 2016, a former employee with the initials S.N. was interviewed and identified Ritdet's writing on numerous monthly summary sheets. Both Walter and Ritdet's bookkeeper explained that Ritdet handled communications with the bookkeeper and tax return preparer.

A brief comparison of the gross receipts reported on the daily tally sheets (Exhibit 5, pages 1 and 2) with the monthly summary sheet (Exhibit 5, page 3) shows the cash-skimming scheme. For example, Exhibit 5, p. 1, reports that on October 21, 2011, Walter Café's total credit card sales was $2,498.92 (not including tips) and, at the bottom of the page, total cash sales were $2,928.89. The monthly tally sheet created by Ritdet correctly shows that on October 21, 2011, Walter Café had credit card sales $2,498.92, but significantly underreports cash sales by reporting only $1,381.79—more than a $1,000 difference. (Exhibit 5, p. 3.) Ritdet did this for each day's entry and provided these false figures to her bookkeeper and tax return preparer who filed tax returns falsely underreporting her income.

The disposition of the unreported funds and the ownership of assets supports the fact that Ritdet controlled the finances and supports a statement made by a former employee, S.N., that Ritdet told her the money from the restaurants belonged to her. Both restaurants, the corresponding properties, the employee residence, and Ritdet and Walter's residence were all in Ritdet's name. Moreover, while Walter and Ritdet were married, Ritdet contracted to have a three-story building constructed in Thailand with a cost of roughly 2,500,000 baht. (Exhibit 6.) The contract is only between the contractor and Ritdet, not Walter. (*Id.*) Furthermore, an analysis of the international wires show that Ritdet wired more than $400,000 from bank accounts that she controlled to foreign bank accounts solely in her name. (Exhibit 8.) The wires listed in Exhibit 8 are only those wires that were directly sent to foreign bank accounts in the name of Ritdet. Also, Ritdet retained private counsel experienced in tax fraud prosecutions, while Walter obtained appointed counsel, further showing Ritdet's control of the unreported funds.

U.S. Dept. of Homeland Security & U.S. Dept. of Labor Investigations

During the execution of IRS search warrants, federal agents found that Ritdet and her husband, employed and housed many individuals illegally present in the United States. The employees resided in one of Ritdet's properties. Between eight and 16 individuals lived at Ritdet's residence at one time. Several of individuals housed at Ridet's property were from Thailand and were illegally present in the United States. Ritdet and Walter specifically told employees not to speak about their immigration status, hired individuals knowing they were illegally present in the United States, and imposed house rules such as prohibiting employees from receiving mail at the residence. Other house rules included no cooking or guests.

At the restaurants, the employees that were illegally present in the United States worked about six days a week, 12 hours per day. Some were paid $20 per six-hour shift (a total of $40 per day), plus tips. Others were paid more, $80-120 per day, but these workers received little or no tips. Some of the employees complained that they were not allowed to take breaks during their shifts. After receiving these complaints, in June 2013, the U.S. Department of Labor, Wage and Hour Division ("DOL"), investigated both restaurants for, among other things, minimum wage and overtime violations. The night before DOL was scheduled to interview employees of the two restaurants, Ritdet and Walter held a

meeting with the employees, many of whom were housed at a residence owned by Ritdet. During that meeting, Walter and Ritdet told employees to tell DOL investigators that they worked eight or fewer hours per day at the two restaurants even though he knew the employees worked 12 hours per day or more. Employees were also told to create time cards that falsely showed that they worked eight or fewer hours per day, which were subsequently provided to DOL. One witness, J.H., who submitted a victim impact statement, stated he was required to swear in front of a Buddha statue that he did not report Ritdet and Walter for labor violations. According to the computations by DOL, Ritdet underpaid her employees by hundreds of thousands of dollars over a three-year period. (Exhibits 1 & 2.)

## II. DISCUSSION

### A. Sentencing Calculation

Trial courts, "while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 267 (2005); *Gall v. United States*, 552 U.S. 38, 51 (2007). The PSR and plea agreement concur that the Guidelines' total offense level is 17, which corresponds to an advisory Guidelines sentencing range of 24 to 30 months' incarceration. The PSR and plea agreement recommend the low-end of the Guidelines, 24 months' incarceration, three years supervised release, restitution, and a mandatory special assessment of $200. This sentence appropriately reflects Ritdet's criminal conduct in this case and should be imposed.

### B. Base Offense Level

Ritdet pled guilty to one count of corruptly endeavoring to impede and impair the lawful administration of the Internal Revenue Laws (Count 1), in violation of 26 U.S.C. § 7212(a); and one count of harboring illegal aliens for commercial advantage or private financial gain (Count 2), in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii),(v)(II), and (B)(i). The applicable Guidelines for these two offenses are as follows:

- Count 1: U.S.S.G. §§ 2T1.1 & 2T4.1(G), and
- Count 2: U.S.S.G. §§ 2L1.1(a)(3) & (b)(2)(A).

The Guidelines for Count 1 are driven by the tax loss in this case, which is $496,987. The tax loss here stemmed from the underreporting of gross receipts received by Ritdet's two restaurants and rental income she received from a rental property she owned, for the 2007 through the 2011 years. Using

the tax loss of $496,987, and applying it to the tax table set forth in § 2T4.1, the base level offense for this crime is 18 because the tax loss is more than $250,000, but less than $550,000. U.S.S.G. § 2T4.1(G).

The Guidelines for Count 2, harboring illegal aliens for commercial advantage or private financial gain, have a base level offense of 12. U.S.S.G. §§ 2L1.1(a)(3). Because the offense involved harboring of between 6 to 24 individuals unlawfully in the United Stats, the Guidelines provide for an increase of 3 levels, for an adjusted offense level of 15. U.S.S.G. § 2L1.1(b)(2)(A).

The crimes of conviction cannot be grouped together as they involve different acts and different victims. Because the Guidelines for Count 1 are highest, we begin with an offense level of 18 and add one unit for that offense, plus another unit for Count 2 because it is within 1 to 4 levels less serious of Count 1, resulting in a combined offense level of 20. U.S.S.G. § 3D1.4.

C. **Criminal History Calculation**

The Government agrees with the PSR that Ritdet's criminal history category is I.

**D. Acceptance of Responsibility**

Both the PSR and the plea agreement recommend a three-point reduction for acceptance of responsibility under U.S.S.G. § 3E1.1.

**E. Section 3553(a) Factors**

Pursuant to 18 U.S.C. § 3553(a), the Court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in" Section 3553(a)(2), and, in so doing, the Court "shall consider," among other things: (1) the nature and circumstances of the offense and the history and characteristics of Defendant; (2) the need for the sentence imposed; (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of Defendant; and (D) to provide Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established by the Guidelines; (5) any pertinent policy statement; and (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. *See* 18 U.S.C. § 3553(a).

The § 3553(a) factors set forth below weigh in favor of a sentence of 24 month prison sentence.

*1. Nature and Circumstances of the Offense and the History and Characteristics of the Defendant*

First, courts consider the entirety of a defendant's history when evaluating this sentencing factor. This includes consideration of the longevity of the offense and the Defendant's criminal history. *United States v. Treadwell*, 593 F.3d 990, 1015, (9th Cir. 2010). Here, Defendant engaged in a five-year campaign (2007-2011) to defraud the United States of taxes and took multiple steps to conceal it, including falsifying records. Despite earning significant income, owning several properties, and having the capability of paying such taxes, Defendant refused to pay tax and opted instead to wire hundreds of thousands of dollars to Thailand. What is worse, she had the capacity to pay her employees minimum wage and overtime wages, the minimum required by law. Instead, of paying the wages required by law, she underpaid her employees and took advantage of a vulnerable group willing to take lower wages to have work. This behavior is inexplicable and incarceration for such behavior is necessary. A 24-month sentence is appropriate.

*2. The Need for the Sentence Imposed: (A) to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense; (B) to Afford Adequate Deterrence to Criminal Conduct*

General deterrence is one of the prescribed goals of every sentencing, *United States v. Pugh*, 515 F.3d 1179,1194 (11th Cir. 2008), but it occupies an especially important role in sentencing for criminal tax offenses, because criminal tax prosecutions are relatively rare:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. ch 2, pt. T, introductory cmt. (emphasis added). *See also United States v. Burgos*, 276 F.3d 1284, 1290 (11th Cir. 2001) (observing "[f]or a judge sentencing a defendant convicted of tax evasion, the chief concern may be general deterrence"). In fact, the importance of imprisonment in tax cases was highlighted in *United States v. Ture*, where the Eighth Circuit vacated a non-prison sentence in a

$250,000 tax evasion case because the district court "failed to consider the importance of a term of imprisonment to deter others from stealing from the national purse." 450 F.3d 352, 358 (8th Cir. 2006). The admonition of the Court of Appeals in *Ture* applies: "the goal of deterrence rings hollow if a prison sentence is not imposed in this case." *Id*.

Here, a significant term of imprisonment should be imposed against the Defendant to deter her and others from committing the crimes in this case. That is especially true given the number of years Ritdet engaged in this conduct. The harm of her criminal conduct is compounded because she cheated her employees out of a fair wage. She was well aware that many of her employees had an illegal immigration status, and she took advantage and lined her pockets with the minimum wage and overtime wages meant for this particularly vulnerable group. Not paying individuals who have earned the wages required to be paid by law is unacceptable. A 24-month sentence here would not only deter Ritdet from engaging in this behavior in the future, but would also serve to deter others that are in similar positions from engaging in this behavior. General deterrence in this case depends upon the public seeing some consequence for Ritdet's crimes.

*3. The Need to Avoid Unwarranted Sentence Disparities Among Defendants*

A 24-month sentence of incarceration is appropriate in order to avoid unwarranted sentence disparities among defendants. The table below identifies multiple cases since 2007 that are within this district and that involve a defendant convicted of committing tax evasion in violation of 26 U.S.C. § 7201. Although Ritdet pled guilty to a different charge (26 U.S.C. § 7212(a)), the Guidelines ranges for tax crimes, as is the case here, are generally driven by the same harm: tax loss, making the chart below instructive. The chart below, coupled with the harboring illegally aliens for commercial advantage or private financial gain conviction, demonstrates that a 24-month sentence is appropriate.

//

//

//

//

//

| Case Name | Docket Number | Year of Sentencing | Sentencing & Restitution | Plea Agreement | Convictions in Addition to Evasion |
|---|---|---|---|---|---|
| U.S. v. Aberle | 4:06-cr-00148 | 2007 | 12 months, $115K | Yes | |
| U.S. v. Lewis | 3:05-cr-00638 | 2007 | 24 months, $909,527 | Yes | |
| U.S. v. Griffin | 4:06-cr-00365 | 2007 | 30 months, $746,000 | Yes | |
| U.S. v. Medina | 3:06-cr-00144 | 2008 | 15 months, $973,000 | Yes | |
| U.S. v. Laereman | 3:09-cr-00972 | 2010 | 12 months, $180,000 | Yes | |
| U.S. v. Maria Reyes | 3:10-cr-00146 | 2011 | 24 months, $141,000 | Yes | |
| U.S. v. Christine Reyes | 3:10-cr-00146 | 2011 | Probation $59,000 | Yes | |
| U.S. v. Purlantov | 4:11-cr-00371 | 2011 | 24 months, $1.47M | Yes | wire fraud |
| U.S. v. Meyer | 4:12-cr-00599 | 2012 | 41 months, $584,000 | Yes | mail fraud |
| U.S. v. Baras | 4:11-cr-00523 | 2014 | 30 months, $593,513 | Trial | theft of government property |
| U.S. v. Jay Soderling | 11-cr-00530 | 2016 | 30 months, 345,697 | Trial | +conspiracy to evade payment of tax |
| U.S. v. Richard Grant | 41-cr-00590-PJH | 2016 | 33 months $402,457.39 | Trial | |

As for the Defendants involved in this case, Walter and Ritdet, there should be no concern that they are arbitrarily being treated differently. Ritdet is far more culpable than Walter for the criminal conduct. Walter was a manager of the restaurants and had little or no control over the finances. The ownership of assets and restaurants, the purchases, and the wires all support the fact that the money belonged to Ritdet. She also prepared the false forms sent to the bookkeeper, had all interactions with the bookkeeper, and benefited most from the cash-skimming scheme. There is no sentencing disparity between the defendants in this case and the recommended sentence is appropriate.

**F. Restitution**

The Government recommends a restitution amount as set forth in the PSR. The restitution for the tax charges has been agreed upon and the amount listed in the PSR is correct. Below is the relevant law supporting the restitution amount to be paid to the individuals identified by initials in the plea agreement and to the U.S. Department of Labor.

<u>Relevant Labor Law</u>

DOL is tasked with enforcing the provisions of the Fair Labor Standards Act ("FLSA"), which requires employers, such as Defendant and his wife, to pay employees minimum wage, overtime wages, and permit them to take breaks. *See* 29 U.S.C. § 206(a)(1)(C). FLSA is the floor, and federal law requires employers to follow state law to the extent it exceeds the minimum wage and overtime wage requirements under FLSA. *See* 29 U.S.C. § 218; *Kim v. Kum Gang, Inc.*, 2015 WL 2222438, at *23 (S.D.N.Y. Mar. 2015) ("For any period when the state's minimum wage exceeded that of federal law, the state-law requirement controls."). From June 2010 through June 2013, California's minimum wage was $8.00 and permitted hours of work to only 8 hours without overtime. CA Lab. Code, § 1182.12; Exhibit 3. Overtime wages are 1.5 times minimum wage.

Individuals illegally present in the United States, like some of those workers identified in this case, are entitled, under federal and California law, to minimum wage and overtime wages for work actually performed. *See Zeng Singh v. Jutla & C.D. & R's Oil, Inc*., 214 F.Supp.2d 1056, 1061-1062. (N.D. Cal 2002) (allegations that employer reported illegal-alien employee to INS with retaliatory intent, after he filed wage claim with state labor commissioner, stated claim for retaliation in violation of FLSA); *Zeng Liu v. Donna Karan Int'l, Inc.*, 207 F.Supp.2d 191, 192 (S.D. NY 2002) (discovery of employee's immigration status irrelevant in FLSA action for unpaid wages for work already performed); *Rivera v. NIBCO, Inc.*, 364 F3d 1057, 1069 (9th Cir. 2004) ("the overriding national policy against discrimination would seem likely to *outweigh* any bar against the payment of back wages to unlawful immigrants in Title VII cases."); Cal. Lab. C. § 1171.5; Gov. C. § 7285 (A person's immigration status is "irrelevant" for purposes of enforcing California labor and employment laws.); *Hernandez v. Paicius* 109 C 4th 452, 460 (2003) (Employers who hire undocumented workers "will also bear the burden of complying with this state's wage, hour and workers' compensation laws.").

Moreover, under California law, unlike Federal law, there is no tip credit. *See* Cal. Lab. Code § 351. A tip credit allows employers to use tips paid to employees toward meeting the employer's requirement of paying minimum wage and part of overtime wages. However, under California Labor Code § 351, tips are the sole property of the employee and cannot be used by an employer to meet minimum wage law. *Id*.

Finally, under California law, an employer may credit rent and meals to an employee's minimum wage and overtime. *See* Exhibit 3. An employer may credit the following amounts to minimum wage and overtime wages for lodging and meals.

| **Lodging** | **Between 1/1/2008 and 6/30/2013** |
|---|---|
| Room Occupied Alone | $37.63 per week |
| Room Shared | $31.06 per week |
| Apartment | 2/3 Ordinary Rental Value But No More Than $451.89 per month |
| Apartment (couple) | $668.46 per month |

| **Meals** | **Between 1/1/2008 and 6/30/2013** |
|---|---|
| Breakfast | $2.90 |
| Lunch | $3.97 |
| Dinner | $5.34 |

*See* Exhibit 3; *Department of Industrial Relations Minimum Wage Order MW-2007; MW-2014;* Cal. Code Regs. tit. 8, § 11050 ¶ 10; *Von Nothdurft v. Steck*, 227 Cal. App. 4th 524, 530–31, (2014).

Unfortunately, the Government was not able to locate all employees identified in Exhibit 2, but most, if not all of the employees working at Ruen Tong Thai Cuisine and Walter Café were provided meals at one or both restaurants and were housed at a residence owned by Ritdet. Accordingly, it has applied the lodging and meal credits to all employees' back wages.

<u>Restitution Owed To Employees Identified In Plea Agreement By Initials</u>

Exhibit 1 is a summary spreadsheet setting forth the computations owed to the employees identified in the plea and in the table below. These amounts are based on California minimum wage from 2008 through 2013 ($8), and corresponding overtime (1.5 x $8) for hours worked exceeding 8 hours per day. The computations in Exhibit 1 account for lodging and meals provided by Defendant as required by California law. *See* Exhibits 1, 2, & 3. Wage Hour Investigator David Yip analyzed DOL's investigation files into Ruen Tong Thai Cuisine and Walter Café, along with numerous employee time

cards seized during the execution of a search warrant on Defendant's residence. (Yip Decl., ¶ 5.) The Government was able to identify the individuals below as unauthorized aliens employed by Ritdet at either Ruen Tong Thai Cuisine and/or Walter Café that were owed back wages.

| Name[2] | Start Date | End Date | Amount Owed |
|---|---|---|---|
| H.T. | 9/26/2009 | 4/28/2012 | $16,336.05 |
| A.R. | 9/26/2009 | 4/28/2012 | $16,336.05 |
| Total | | | $32,672.10 |

*See* Exhibit 1. The computations and underlying computations were provided to Probation and Ritdet's attorney. Restitution in the amounts set forth above should be paid to these employees because they are victims as defined under the Mandatory Victims Rights Act.

<u>Restitution To Be Paid To U.S. Department of Labor</u>

A total restitution amount of $38,096.55 should also be paid to DOL on behalf of those employees identified in Exhibit 2. Exhibit 2 identifies numerous employees to whom Defendant owes back wages, but whom the Government could not confirm as unlawfully in the United States and/or hired by Ritdet a part of his crime of conviction. Ritdet has agreed to pay the restitution amount to DOL set forth in the plea, $38,096.55.

Upon receiving the back wages in the amount of $38,096.55, DOL will distribute those funds to the individuals identified in Exhibit 2. DOL is the appropriate agency to distribute these funds because DOL routinely distributes back wages collected from employers to employees owed such wages. (Yip Decl., ¶ 9.) DOL will use its resources, as it routinely does, to locate these individuals and give them the wages they are rightfully due. (*Id.*) Because the $38,096.55 amount is less than the back wages computed by DOL, DOL will pay each employee a percentage of the $38,096.55 that corresponds to a ratio. (*Id.*, Exhibit 2.) The ratio is the original back wages owed to a specific employee divided by the original total back wages owed to all. (*Id.*) That calculation results in a percentage for each employee, which is then multiplied by the total agreed upon amount to be paid to the employees, $38,096.55. (*Id.*)

[2] After an analysis, it was determined that T.O., J.H. and P.S. received at least the wages required to be paid to them under minimum and overtime wage laws, after accounting for lodging and meals.

This results in the final gross amount to be paid to each employee. (*Id.*) Exhibit 2 sets forth the gross amount each employee will be paid. (*Id.*) DOL will make multiple attempts to contact each employee identified in Exhibits 1 and 2. (*Id.* at ¶ 10.) However, after three years, any back wages that have not been distributed or claimed because of inability to locate the proper person(s) or because of their refusal to accept payment shall be deposited into the Treasury of the United States as miscellaneous receipts. (*Id.*)

The United States has contacted those individuals identified as victims in this case, but only two have submitted victim impact statements. One has already been provided to the Court. The second was only recently provided to the Government and the Government is in the process of translating the statement and will provide it to the Court as quickly as possible.

**CONCLUSION**

For the foregoing reasons, the Government respectfully recommends the following sentence against defendant Yaowapha Ritdet: 24 months' incarceration, three years supervised release, restitution in the total amount of $567,755.66, and a mandatory special assessment of $200. This sentence accurately reflects Ritdet's criminal conduct.

Respectfully submitted this 19 day of April, 2017,

BRIAN J. STRETCH
United States Attorney

*/s/ Jose A. Olivera*
JOSE A. OLIVERA
Assistant United States Attorney